IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF GEORGIA

ATLANTA DIVISION

```
--------------------------------X
                                  :
GEORGIACARRY.ORG, INC. and        :
CHRISTOPHER RAISSI,               :
                                  :
           Plaintiffs,            :   CIVIL ACTION
                                  :
VS.                               :   FILE NO.
                                  :
METROPOLITAN ATLANTA RAPID        :   1:09-CV-0594-TWT
TRANSIT AUTHORITY, WANDA          :
DUNHAM, in her official           :
capacity as Chief of the          :
MARTA Police, JOSEPH DORSEY,      :
in his official capacity as       :
Assistant Chief of the MARTA      :
Police, OFFICER DOE 1,            :
OFFICER DOE 2, OFFICER DOE 3,     :
OFFICER DOE 4 and OFFICER         :
DOE 5,                            :
                                  :
           Defendants.            :
                                  :
--------------------------------X
```

The deposition of TERRY MILTON, Deponent;

the reading and signing of the deposition being

waived; taken before Stephanie J. Heisey, Deposition

Officer and Certified Court Reporter, commencing at

10:17 o'clock, a.m., July 30, 2009, at MARTA, 2424

Piedmont Road, Atlanta, Georgia.

-----------------------------------------------------

American Court Reporting Company, Inc.

52 Executive Park South, Suite 5201
Atlanta, Georgia  30329

404-892-1331                          800-445-2842

```
 1 │ APPEARANCES OF COUNSEL:

 2 │     FOR THE PLAINTIFFS:

 3 │         JOHN R. MONROE, ATTY. AT LAW
   │         9640 Coleman Road
 4 │         Roswell, Georgia 30075
   │         Telephone: (678) 362-7650
 5 │         john.monroe1@earthlink.net

 6 │     FOR THE DEFENDANTS:

 7 │         PAULA M. NASH, ATTY. AT LAW
   │         MARTA
 8 │         2424 Piedmont Road
   │         Atlanta, Georgia 30324
 9 │         Telephone: (404) 848-5220
   │         pmnash@itsmarta.com
10 │
   │     ALSO PRESENT:
11 │
   │         Christopher Raissi
12 │         Edward Warren
   │         Malcolm Nicholas
13 │

14 │

15 │

16 │

17 │

18 │

19 │

20 │

21 │

22 │

23 │

24 │

25 │
```

1                          C O N T E N T S

2                       E X A M I N A T I O N

3                                                    Page

4         Cross-Examination by Mr. Monroe.............4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                   P R O C E E D I N G S

2                   MR. MONROE:  If you'll swear in the

3           witness, please.

4                   (Whereupon,

5                    TERRY MILTON,

6                   was called as a witness and, having

7                   been duly sworn, was deposed and

8                   testified as follows)

9                   CROSS-EXAMINATION

10   BY MR. MONROE:

11          Q.    Would you state your name for the record,

12   please.

13          A.    Terry Milton.

14          Q.    Officer Milton, have you ever given a

15   deposition before?

16          A.    Yes, sir.  Once.

17          Q.    What was the context there?

18          A.    Excuse me?

19          Q.    In what -- what was the case where you

20   gave a deposition?

21          A.    I assume -- I think it was an injury

22   case.

23          Q.    A case -- were you injured?

24          A.    No, sir.  It was a patron.  An accident

25   case on MARTA.

1       Q.    Oh, I see.  Were you a witness?

2       A.    Yes.  Yes, sir.

3       Q.    Just a couple of things to keep in mind

4  to remind when you are giving a deposition is there's

5  a court reporter here taking down everything we say.

6  So because of that if you wait until I finish asking

7  a question to answer it so that she can record it

8  accurately, that would be helpful.  If I ask a yes

9  question or no question if you can try to remember to

10  say yes or no instead of moving your head or saying

11  uh-huh or huh-uh because those things are difficult

12  to transcribe.  Okay?

13       A.    Yes.

14       Q.    All right.  If I ever ask you a question

15  that you don't understand or that you want

16  clarification of, feel free to do so.  I'll try to

17  make sure you understand the question.  If you don't

18  ask I'll assume that you do understand the question.

19       A.    Yes, sir.

20       Q.    If you need to take a break, you know,

21  use the restroom, get a drink or something, just let

22  us know and we'll do that.  Okay?

23       A.    Yes.

24       Q.    All right.  Where do you work?

25       A.    With MARTA Police Department.

1          Q.     And how long have you been there?

2          A.     I've been with MARTA almost 16 years.

3          Q.     And what is your position there?

4          A.     Police officer.

5          Q.     Is that the position you've held for

6     those 16 years?

7          A.     Yes, sir.

8          Q.     Where did you work before MARTA?

9          A.     Georgia Department of Corrections.

10         Q.     Okay.  What did you do there?

11         A.     I was a corrections officer.

12         Q.     How long were you there?

13         A.     Maybe two years.

14         Q.     And before that?

15         A.     I moved from Mississippi.  McDonalds.

16         Q.     So was the --

17         A.     Sports Town --

18         Q.     Okay.

19         A.     -- in Atlanta.

20         Q.     Was the Department of Corrections then

21    the beginning of your law enforcement career?

22         A.     Yes, sir.

23         Q.     What kind of education do you have?

24         A.     High school.  Graduated high school

25    1982.  Two years of -- two and a half years of

1  college.

2          Q.     Where was that?

3          A.     Mississippi State/Mississippi Valley

4   State.

5          Q.     Did you earn a degree?

6          A.     No, sir.

7          Q.     What did you study in college?

8          A.     Sociology/pre-law -- not pre-law but

9   criminal justice.

10         Q.     Outside of that formal education do you

11  have any training courses or anything like that that

12  you've taken related to law enforcement work?

13         A.     Prior coming to MARTA?

14         Q.     Before or after.

15         A.     Explain.  Could you explain.

16         Q.     Sure.  Like I assume like perhaps you've

17  taken some POST courses?

18         A.     Yes.

19         Q.     You might have taken some continuing

20  education courses of some type, I don't know.

21         A.     I've had training, POST training.

22         Q.     You're POST certified?

23         A.     Yes, sir.

24         Q.     When did you first get your POST

25  certification?

```
1          A.      1993.

2          Q.      Have you had any courses dealing with

3   encounters with people who are carrying weapons?

4          A.      I can't recall.

5          Q.      Were you working on October 14th of 2008?

6          A.      October 14th of 2008?

7          Q.      Yes.

8          A.      Yes, sir.

9          Q.      You were on duty working as a MARTA

10  police officer then?

11         A.      Yes, sir.

12         Q.      What was your assignment that day, do you

13  remember?

14         A.      Is this the date concerning the

15  incident?

16         Q.      Yes, it is.

17         A.      I think I was -- I was 247 at Avondale

18  train station.

19         Q.      What does that mean?

20         A.      That's my beat, my call I was assigned.

21         Q.      And are there particular duties or

22  assignments that go along with that?

23         A.      Patroling that station, that parking lot,

24  the inside and outside of the station.

25         Q.      So your assignment would have been just
```

1   at the Avondale station during that shift?

2       A.    Unless I was given a call to go to

3   another station.

4       Q.    You weren't moving from station to

5   station or anything like that?

6       A.    No, sir.

7       Q.    Were you on foot or using a bicycle or

8   car?

9       A.    I was on bike patrol but I might have

10  been on foot that day.

11      Q.    Now can you describe the events that led

12  up to your encounter with Mr. Raissi?

13      A.    On that particular day I responded to a

14  call of a patron carrying a weapon coming from the

15  parking lot. My sergeant, he gave out the call of

16  the patron carrying the weapon coming across the

17  bridge. And upon responding to the call, Mr. Raissi

18  was stopped by Sergeant Nicholson (sic) which he

19  identified himself and took his weapon from behind

20  his back, radio check. Or we did ask him for a

21  weapons permit which he voluntarily gave a weapons

22  permit.

23      Q.    So was the -- try to break that down a

24  little bit. The initial call came on the radio?

25      A.    Yes, sir.

1          Q.     That was from Sergeant Nicholas?

2          A.     Yes, sir.

3          Q.     What did he say do you remember?

4          A.     From my recollection he stated he had

5    just observed a 30-W male with 69-G which is a gun.

6          Q.     Did you say 30-W male?  Is that what you

7    said?

8          A.     Yes.

9          Q.     What does that mean?  What does the 30-W

10   part mean?

11         A.     W stands for white.

12         Q.     And the 30?

13         A.     Just a signal code.

14         Q.     What does it mean?

15         A.     I can't recall right at this moment.  Go

16   ahead.

17         Q.     Is that -- that's like a 10 code or

18   something?

19         A.     Yes, sir.

20         Q.     I didn't mean to stop you.  So a 30-W

21   male and what else?

22         A.     Carrying a weapon.

23         Q.     Carrying a weapon.  Okay.  Did he give

24   any further description?

25         A.     I can't recall.

1        Q.    Did he say what kind of weapon it was?

2        A.    No, sir.

3        Q.    And where were you when you heard that

4   call, do you recall?

5        A.    I think I was in the south -- I mean

6   north parking lot of Avondale train station.

7        Q.    And that's -- you said the call came from

8   the south parking lot; is that right?

9        A.    The call came from -- Sergeant Nicholas

10  was in the south parking lot, yes, sir.

11       Q.    Where did he say that the 30-W male was?

12       A.    Walking across the bridge.

13       Q.    That's the bridge going from the south

14  parking lot over the road into the station; is that

15  right?

16       A.    Yes, sir.

17       Q.    And you were in the north parking lot

18  which is on the other side of the station?

19       A.    Yes, sir.

20       Q.    Then what did you do when you heard the

21  call?

22       A.    I responded and came to the concourse

23  area of the Avondale train station.

24       Q.    And I think you said Sergeant Nicholas

25  stopped Mr. Raissi; is that right?

AMERICAN COURT REPORTING COMPANY

1    A.    To the best of my recollection as I was

2  approaching I saw the described person.  As I was

3  approaching, I saw Sergeant Nicholas stop the subject

4  as well.

5    Q.    Does that mean that you both approached

6  him at about the same time?

7    A.    I might have been two or three seconds

8  maybe just behind him.

9    Q.    Okay.  And where was Mr. Raissi when he

10  was stopped?

11    A.    Concourse -- I want to say the concourse

12  area of the station in front of the fare gates.  Just

13  beyond the fare gates.

14    Q.    When you say beyond you mean outside of

15  the fare gates?

16    A.    Outside of the pay area, yes, sir.

17    Q.    And do you know where Sergeant Nicholas

18  was when he made the radio call?

19    A.    I'm assuming he was in the south parking

20  lot when he made the radio call.

21    Q.    Okay.  Did you see him approaching Mr.

22  Raissi from a particular direction?

23    A.    When I was responding to the call I was

24  coming from the north parking lot into the station.

25  In the concourse area I saw Mr. Raissi and behind Mr.

AMERICAN COURT REPORTING COMPANY

sih58728-1

1  Raissi I saw Sergeant Nicholson (sic) approaching.

2       Q.    So Sergeant Nicholas approached him from

3  behind?

4       A.    Coming down the steps, yes, sir.

5       Q.    Okay.  Was that consistent with Sergeant

6  Nicholas coming from the south parking lot?

7       A.    Yes, sir.

8       Q.    And was Mr. Raissi moving or was he doing

9  anything in particular at the time he was stopped?

10      A.    No, sir.

11      Q.    He was standing still?

12      A.    He was walking towards the fare gates.

13      Q.    He was approaching the fare gates?

14      A.    Yes, sir.

15      Q.    And you think it was Sergeant Nicholas

16 who made the first encounter with Mr. Raissi?

17      A.    I think so.

18      Q.    Were you close enough to hear what

19 Sergeant Nicholas said to him?

20      A.    I can't recall.

21      Q.    Then what did you see then as Sergeant

22 Nicholas approached him?

23      A.    I saw Sergeant Nicholson (sic) say

24 something and I saw him take the weapon out of Mr.

25 Raissi's back at which time I was there.  We ran a

14

1   check on the subject. He saw his -- he asked for his

2   weapons permit which he -- like I say he gave the

3   weapons permit. We ran a check on the subject, Mr.

4   Raissi.

5        Q.    When Sergeant Nicholas took Mr. Raissi's

6   gun, what was your view of the two at that time?  In

7   other words were you in a position that you could

8   actually see the gun on Mr. Raissi's body or did you

9   only see the gun after it had come out of the

10  holster?

11       A.    After it came out of the holster.  Mr.

12  Raissi was in between -- I think he was in between

13  myself and Sergeant Nicholas.

14       Q.    And you said his gun was in the small of

15  his back; is that right?

16       A.    Yes.  I want to say that because he took

17  it out of his -- it appeared to take it out of the

18  small of his back.

19       Q.    But you couldn't actually see because Mr.

20  Raissi's body was blocking your view?

21       A.    Yes, sir.

22       Q.    Then after Sergeant Nicholas took the

23  gun, what did he do with the gun?

24       A.    I can't -- I don't remember. I don't

25  know if he put it in his waistband or he just held

AMERICAN COURT REPORTING COMPANY

1    the gun and ran the radio check.

2         Q.    Did you ever take possession of the gun?

3         A.    No, sir.

4         Q.    You never touched it?

5         A.    No, sir.

6         Q.    Never looked at it other than just to

7    observe that it was there?

8         A.    Yes, sir.

9         Q.    When Sergeant Nicholas took Mr. Raissi's

10   gun, what was Mr. Raissi doing?

11        A.    What was he doing?

12        Q.    Yes.

13        A.    He had stopped and he wasn't doing

14   anything.

15        Q.    He was just standing?

16        A.    Yes.  He was standing at that time after

17   the weapon was taken.

18        Q.    Did he make any resistive motions or

19   efforts or anything?

20        A.    No, sir.

21        Q.    What was he doing with his hands?  Were

22   they at his side?  Did he have them raised?  Do you

23   recall?

24        A.    After the weapon was taken?

25        Q.    Well when Sergeant Nicholas first

1  approached him and while the weapon was being taken
2  and then afterwards.

3          A.     As far as I can recollect he was
4  approaching -- walking towards the fare gates when
5  Sergeant Nicholas stopped him.  I'm going to assume
6  his hands were on his side.

7          Q.     Did he have anything in his hands?

8          A.     I can't remember.

9          Q.     Was he carrying anything else other than
10  just wearing his clothing that you recall?

11          A.     I can't remember.

12          Q.     Do you recall if he had any photographic
13  equipment with him?

14          A.     I don't remember.  I don't remember.  But
15  he stated that he was but I don't remember.

16          Q.     Then after Sergeant Nicholas had taken
17  Mr. Raissi's gun, what happened after that?

18          A.     A radio check was ran.  Saw the permit.
19  The check came back 28, everything was good.
20  Nothing -- nothing was wrong.  At which time I think
21  Sergeant Nicholas asked Mr. Raissi to go into this
22  room, go into the hallway of one of the stations in
23  the hallway and reholster his weapon.

24          Q.     Did you speak with Mr. Raissi at all
25  during this encounter?

AMERICAN COURT REPORTING COMPANY

sjh58728-1

1       A.    I don't think so, no, sir.  I don't

2   recall speaking to him.

3       Q.    Is it fair to say you were more or less

4   acting as a backup?

5       A.    Yes, sir.

6       Q.    Do you recall any questions that Sergeant

7   Nicholas asked Mr. Raissi?

8       A.    Other than his drivers license -- let me

9   see your drivers license and you have a permit.

10  Other than that.

11      Q.    Okay.  He asked him for a drivers license

12  and asked him for a firearms license?

13      A.    Yes, sir.

14      Q.    Okay.  You don't recall anything else?

15      A.    Well when we were in the 28 check he may

16  have asked him for his Social Security number.

17      Q.    You don't remember if he did or not?

18      A.    Yes, yes.

19      Q.    That was after Sergeant Nicholas had

20  taken his gun?

21      A.    Yes, sir.

22      Q.    And then did Mr. Raissi give his drivers

23  license, his firearms license and his Social Security

24  number?

25      A.    Yes, sir.

1       Q.    And then you said there was a radio check

2  done.  What does that mean?

3       A.    You do what's called a 28.  You check to

4  confirm -- we check to confirm to see if everything

5  is in order.  If everything is -- we check to

6  confirm, make sure the subject is who he say he is to

7  confirm his identification.

8       Q.    Okay.  How is that done, do you know?

9       A.    I don't know.  Radio system, radio check.

10      Q.    Okay.  Well what -- I mean you're there

11  with Mr. Raissi or Sergeant Nicholas.  He has his

12  firearms license and his drivers license and his

13  Social Security number.  I guess you can more or less

14  see that the person and the drivers license is

15  apparently the person standing there.  What

16  information is given over the radio that would

17  further confirm the identity?

18       A.    Mr. Raissi's name, his date of birth.

19       Q.    And what does the -- is the person you're

20  talking to a dispatcher then --

21       A.    Yes, sir.

22       Q.    -- on the radio?  What does that person

23  do with that information, do you know?

24       A.    I don't know because I've never worked in

25  there in that atmosphere.  I'm assuming they do what

1  you call a GCIC check, a Georgia criminal check.

2          Q.    So they would be taking the information

3  you provide and then giving information like criminal

4  background, whether there are warrants outstanding,

5  things like that?

6          A.    Yes, sir.

7          Q.    And all that came back with no criminal

8  history and no outstanding warrants?

9          A.    Exactly.

10         Q.    Now at this time -- at the time of the

11  incident on October 14th of 2008, did you believe

12  that MARTA had a policy regarding people with

13  firearms in the MARTA system?

14         A.    Did I believe that MARTA had a policy?

15         Q.    Yes.  In other words did you believe

16  there was some policy on what you should do if you

17  see someone carrying a weapon, a firearm in the MARTA

18  system?

19         A.    No.

20         Q.    Did you have a practice of what you did

21  if you saw people with firearms?

22         A.    We had a particular roll call training, a

23  bulletin training.

24         Q.    What did that consist of?

25         A.    The training consist of explaining the

AMERICAN COURT REPORTING COMPANY

sjh58728-1

1    new law that had just come out concerning patrons

2    carrying weapons.  And if that person -- that patron

3    had a weapon, he had to have a -- if he's going to be

4    carrying it on MARTA, he had to have a weapons

5    permit, a valid weapons permit.

6         Q.    By that you mean a firearms license; is

7    that right?

8         A.    Yes, sir.

9         Q.    And then as part of that training did you

10   have an understanding of what you were supposed to do

11   when you see someone carrying a firearm?

12        A.    Yes, sir.

13        Q.    What were you supposed to do?

14        A.    Stop that subject and ask for his permit,

15   his firearms permit.

16        Q.    And then at that time what was the

17   practice or what were you supposed to do after you

18   stopped the person and obtained the firearms

19   license?  Then what did you do?  What were you

20   supposed to do?

21        A.    What we were supposed to do, we didn't

22   have a policy or anything but what we would do, run a

23   check.

24        Q.    The GCIC check you were speaking about?

25        A.    Yes, sir.

AMERICAN COURT REPORTING COMPANY

sih58728-1

1      Q.      Is that still what you do?

2      A.      No, sir.

3      Q.      Now what do you do?

4      A.      Now we just see the permit, the firearms

5   weapons permit.  If the date on it is valid, it

6   matches the drivers license, the subject is allowed

7   to continue on his way.

8      Q.      Do you do anything to verify the firearms

9   license, the validity of it other than just from your

10  own inspection of it and comparing it to the drivers

11  license?

12     A.      Repeat the question.

13     Q.      Do you do anything to verify that the

14  firearms license is valid other than inspect it

15  yourself and compare it to the information on the

16  drivers license?

17     A.      No, sir.

18     Q.      You don't make any effort to contact like

19  the probate court that issued it or anything like

20  that?

21     A.      No, sir.

22     Q.      And at this time on October 14th of 2008,

23  did you have an understanding of what you were

24  supposed to do if a person refused to give a firearms

25  license when asked?

1     A.     Did I have an understanding of what I

2   should do if the person refused to give --

3     Q.     A firearms license.

4     A.     Yes.  Vaguely, yes.

5     Q.     And what do you think you were supposed

6   to do?

7     A.     Run a check on that subject and arrest

8   the subject for carrying a weapon without a permit.

9     Q.     You're talking about the misdemeanor of

10  carrying a pistol without a license; is that right?

11    A.     Yes, sir.

12    Q.     I guess just to complete the picture then

13  what were you supposed to do if it weren't a pistol

14  but were a rifle or a shotgun?

15    A.     If it was a rifle or shotgun, the

16  question has been asked several times.  I'm kind of

17  vague on it.  I don't know.

18    Q.     Is that -- with regard to the pistol then

19  is that still your understanding of what you're

20  supposed to do if someone refused to give a firearms

21  license?

22    A.     Repeat that.

23    Q.     Just going back to just pistols again, is

24  it your understanding that nothing has changed.  That

25  if somebody refuses to give a firearms license, you

AMERICAN COURT REPORTING COMPANY

1   should still arrest them for carrying a pistol

2   without a permit?

3       A.    I don't know.

4       Q.    You don't know that anything has changed

5   though; is that right?

6       A.    Yes, sir.

7       Q.    Did -- I think so far the only thing

8   you've said that you heard Mr. Raissi say is his

9   Social Security number.  Did you hear him say

10  anything else?

11      A.    No, sir.  I thought he was pretty -- he

12  was calm.

13      Q.    Was he -- he was cooperative?

14      A.    Very cooperative.

15      Q.    Let me show you some pages from -- I

16  guess it's from a dispatch log that your counsel

17  supplied to me.  I don't know if it's a matter of

18  routine in your job you see things like this but does

19  that kind of thing look familiar to you?

20      A.    I don't see these every day but

21  occasionally I have seen this before.  I don't see it

22  every day.

23      Q.    All right.  Actually let me give you

24  these that have some markings on them because these

25  are easier to look at I think.  Actually let me point

1  some things out to you. This one has the marking on

2  it. On this one which is marked at the bottom page 4

3  of 10, there's an entry that's been marked that I

4  think is the entry of Sergeant Nicholas calling in

5  the person with a weapon. Does that seem right to

6  you?

7       A.    I've been here 16 years -- almost 16

8  years and this might be my second time seeing a

9  dispatch log. Just from looking at it, yes.

10      Q.    Okay. Actually the only thing I wanted

11  to ask you about was the reason I was bringing this

12  up is looking through the entries after that up until

13  on the next page when it looks like Sergeant Nicholas

14  was clear, I didn't see anything that looked like it

15  might have been you. And I was wondering did you

16  call in on the radio and say that you were -- that

17  you were responding or that you were on the scene or

18  anything like that?

19      A.    Yes, I think I did. If I can recollect I

20  think I did.

21      Q.    Okay. Do any of the entries after the

22  one where Sergeant Nicholas called in the person with

23  a gun or person with a weapon look like that to you?

24      A.    As far as me responding to the call?

25      Q.    Right.

1      A.    No, sir.  Not on this sheet.

2      Q.    Okay.  This is the next sheet.  It looks

3  like Sergeant Nicholas was clear very close to the

4  top.  Is there anything on that page that looks like

5  you being involved in the call?

6      A.    No, sir.

7      Q.    There's a column on those sheets marked

8  unit and then there are some code there and it looks

9  like Sergeant Nicholas was P547; is that right?

10      A.    Okay.  Sir, this -- I'm 547.  This is my

11  unit.  I'm 547.  I was looking for my badge number.

12  I was looking for 319 which is my badge number but I

13  am 547 Avondale.  That's bike patrol unit.

14      Q.    I see.  Okay.  So does that mean that

15  what's perhaps missing from this is Sergeant

16  Nicholas's call?

17      A.    I don't see his call sign on here.

18      Q.    Do you know what his unit number would

19  have been?

20      A.    No, sir.  I don't.

21      Q.    Okay.  Do you have the same unit number

22  every day or does that change?

23      A.    It changes.

24      Q.    Okay.  But -- how do you know yours was

25  P547 on that day?

1          A.     Because the 5 that's a bike officer's

2    call sign.   547.

3          Q.     Okay.

4          A.     I was working Avondale, 47.   I was

5    working 547 beat.

6          Q.     So that number relates to your assignment

7    for the shift?

8          A.     Yes, sir.

9          Q.     Thanks.   Other than taking Mr. Raissi's

10   firearm, did either you or Sergeant Nicholas ever

11   touch him for any other purpose?

12         A.     I can't recall.

13         Q.     Did either of you search him?

14         A.     I didn't.   I can't recall.

15         Q.     But you did not?

16         A.     No, sir.

17         Q.     Did -- I guess you said you didn't look

18   at the gun so I'll ask about Sergeant Nicholas.   Do

19   you know if he called in the serial number of the

20   gun?

21         A.     I don't remember.   I don't think so but I

22   don't remember.

23         Q.     Did Sergeant Nicholas at any point,

24   before the gun was given back to Mr. Raissi, do any

25   inspection of the gun that you saw?

```
 1        A.    Did he do any inspection of the gun?
 2        Q.    Yes.
 3        A.    I don't think so.  I can't recall.
 4        Q.    Did he check to see if it was loaded?
 5        A.    Good question.  I don't remember.  I
 6   can't recall.
 7        Q.    Did he unload it -- well let me --
 8        A.    I don't think so but I can't recall.
 9        Q.    I was going to break that down in to two
10   parts.  Did he take the magazine out?
11        A.    I don't remember.
12        Q.    You don't remember.  Okay.  Do you
13   remember what kind of gun it was?
14        A.    No, sir.
15        Q.    You carry a gun; is that right?
16        A.    Yes, sir.
17        Q.    What kind of gun do you carry?
18        A.    A Glock.
19        Q.    What model?
20        A.    A Glock --
21        Q.    That's all right.  Do you know what
22   caliber it is?
23        A.    45.  I'm sorry, 22.  I'm sorry.
24        Q.    A Glock 22?
25        A.    Yes.
```

1          Q.     Before Mr. Raissi was stopped and checked

2    out, did you have any reason to believe he had

3    committed a crime?

4          A.     Did I have any reason --

5          Q.     Yes.

6          A.     -- to believe that he committed a crime?

7          Q.     Yes.

8          A.     No, sir.

9          Q.     Did you have any reason to believe he was

10   about to commit a crime?

11         A.     Upon the radio call that came -- that I

12   responded to, the reason was suspicion, yes, sir.

13         Q.     And what crime did you think he might

14   have been about to commit?

15         A.     Well the radio call that came out,

16   subject had a gun.  I didn't know -- we didn't know

17   if he had a permit to carry it or not.

18         Q.     I don't want to be argumentative but

19   didn't you testify earlier that the call was just

20   that he had a weapon and that the kind of weapon

21   wasn't identified?

22         A.     The weapon, 69-G.

23         Q.     Okay.

24         A.     Which is a gun.

25         Q.     Oh.  It is a gun?

AMERICAN COURT REPORTING COMPANY

1        A.     69-G is a gun, yes, sir.

2        Q.     So you had a radio call that he had a gun

3   and you did not know if he had a firearms license; is

4   that --

5        A.     Yes, sir.

6        Q.     So I don't want to put words in your

7   mouth but are you saying that you believed he might

8   have been committing a crime of carrying a pistol

9   without a license?

10       A.     No, sir.  We was running a check.  We was

11  only running a weapons check to see if he had a

12  permit for that weapon.

13       Q.     Okay.  Well let's start back from the

14  original question.  I was asking if you believe -- if

15  you believe that he might have been about to commit a

16  crime.

17       A.     It was a possibility a crime could have

18  been committed.

19       Q.     And what crime is that?

20       A.     I don't know.

21       Q.     Well what do you mean when you say it's

22  possible?

23       A.     The reason is suspicion.  The particular

24  fact that he had a firearm.  He did -- he was

25  carrying a firearm.  I don't know if he had a weapons

AMERICAN COURT REPORTING COMPANY

1   permit with it or not.

2        Q.   So you're saying it's possible he was

3   committing the crime of carrying a pistol without a

4   license?

5        A.   No, sir.  Say the question again, sir.

6        Q.   So are you saying it's possible that he

7   was committing the crime of carrying a pistol without

8   a license?

9        A.   It could have been.

10       Q.   Anything else?

11       A.   No, sir.

12       Q.   So does it boil down to you had

13   information that he was carrying a gun, you didn't

14   know if he had a license, so he might have been

15   committing the crime of carrying a pistol without a

16   license?

17       A.   We wanted to check and see, yes, sir.

18       Q.   Do you recall how Sergeant Nicholas gave

19   Mr. Raissi his gun back?  I mean did he hand it to

20   him?

21       A.   I can't recall.  I don't know if he

22   handed it to him.  I don't know if he gave it to him

23   when he got in the hall.  I don't remember.

24       Q.   Okay.  So does that mean you don't know

25   where he gave it to him either?

1          A.    I can't remember.

2          Q.    Now when you talk about the hall, tell me

3    about regardless of when the gun was given back, what

4    was going on in the hall?

5          A.    We have several rooms in this area, staff

6    rooms for the police officers, staff rooms for the

7    other employees of MARTA.   Just a little narrow hall

8    to get out of the way, take him out of the way of the

9    public.

10         Q.    And what happens in this area?

11         A.    Explain.

12         Q.    Well let me back up.

13         A.    Are you asking why we took him to the

14   hall?

15         Q.    Let me break it down.   You started with

16   the encounter was near the fare gates I think you

17   said; is that right?

18         A.    Yes, sir.

19         Q.    Then at some point the three of you went

20   into this hall area that you're describing; is that

21   right?

22         A.    No, sir.

23         Q.    Okay.   Who went to the hall area?

24         A.    We -- all three of us might have went but

25   I don't think I went.   It was just I think Sergeant

1  Nicholson (sic) and Mr. Raissi went into the hallway

2  that I can remember.

3        Q.    Okay.

4        A.    And he gave the weapon back to Mr.

5  Raissi.  I think he gave it back to him then and Mr.

6  Raissi supposedly placed it back in his holster.

7        Q.    But you weren't there?

8        A.    I might have been.  I can't remember.

9  I'm struggling to remember that issue.

10       Q.    You don't recall where Mr. Raissi was

11  when his gun was returned to him?

12       A.    No, sir.

13       Q.    And this hall area that you're

14  describing, is it a public area?

15       A.    No, sir.

16       Q.    Is it off limits to the public?

17       A.    Yes, sir.

18       Q.    Is there some kind of sign indicating

19  that?

20       A.    I want to say yes.  I want to say the

21  sign says authorized personnel but I'm not for sure.

22       Q.    Is there some kind of door that you have

23  to go through to get to that area?

24       A.    Actually you just open the door and you

25  are in that area.

1       Q.    Is the door normally kept locked?

2       A.    Yes, sir.

3       Q.    With a like a key lock or security code

4  lock?

5       A.    A key lock.

6       Q.    I assume that's something you would have

7  a key for?

8       A.    Yes, sir.

9       Q.    Who else would have a key for that?

10      A.    Other MARTA employees.

11      Q.    I guess whatever officers are working in

12  that area or is it a master kind of lock that all the

13  officers in the system would have a key to it?

14      A.    Yes.  Repeat that again now.

15      Q.    Is it a lock that's common throughout the

16  MARTA system so that every officer would have a key

17  to enter?

18      A.    Yes, sir.

19      Q.    Now the drivers license and the firearms

20  license, Mr. Raissi gave those to Sergeant Nicholas

21  or to you?

22      A.    Sergeant Nicholson (sic).

23      Q.    So you never looked at them; is that

24  right?

25      A.    No, sir.  I don't recall looking at it,

1   no, sir.

2          Q.   Did you write any kind of report or

3   anything about this incident?

4          A.   No, sir.

5          Q.   Do you know what Mr. Raissi did after his

6   gun was returned to him?

7          A.   Actually I don't.  I want to say he paid

8   his fare and went to the system but I really don't

9   know.

10          Q.   Did you make it a point of watching him

11   after he was released?

12          A.   I can't recall.

13          Q.   Do you remember when you called in --

14   going back to this dispatch log there's an entry in

15   here with P547 clear.  I assume that would have been

16   you calling in to the dispatcher that that encounter

17   was over from your perspective; is that right?

18          A.   Repeat that again now.

19          Q.   The entry in the dispatch log that we

20   looked at earlier on the second page there was an

21   entry for the unit was P547.  That's you; right?  And

22   the status is clear.  And then it's the same incident

23   number as the initial -- as the initial entry so

24   I'm --

25          A.   The status -- by me saying clear, I'm

1  clear on the call.

2       Q.     So you were finished with Mr. Raissi and
3  going back to resuming your patrol.  Is that what
4  that means?

5       A.     Upon that call right there if I stated I
6  was clear, I was responding to the call.  I was
7  advising radio that I was clear of the call that had
8  just come out.  If -- yeah, I was clear of the call.

9       Q.     The call involving Mr. Raissi?

10      A.     Yes, sir.  I was clear -- yeah, on the
11 call that had just been dispatched.

12      Q.     Do you remember when you radioed in that
13 you were clear in conjunction with what was happening
14 with Mr. Raissi?

15      A.     I would like to think I was -- after
16 Sergeant Nicholson (sic) dispatched the call, I would
17 like to think I responded right then and there.  I'm
18 clear on the call.  En route -- en route to the
19 location.  I like to think I responded that way.

20      Q.     I think we might be talking past each
21 other so let me show you the dispatch log again.  I
22 was talking about the entry here marked clear.  Not
23 the entry here where it looks like you were
24 dispatched and arrived.  So I was talking about this
25 entry.  When you say you were clear, I thought you

1   were saying that means you're finished with the call,

2   not that you were on the way.

3        A.    Like I say I'm not used to this dispatch

4   log.  I don't know how it really works.  I

5   wouldn't -- if I was -- if the call was over I would

6   have said code 7, back in service.

7        Q.    So you're not sure what the status of

8   clear necessarily means on the dispatch log?

9        A.    On the dispatch radio log, no, sir.

10        Q.    At this station, the Avondale station,

11   are the tracks where the trains come at the same

12   level as the fare gates or do you have to go up or

13   down to get to the trains?

14        A.    You have to go up or down.  They are not

15   on the same location, same level.

16        Q.    So does that mean during the encounter

17   with Mr. Raissi you were not in a position to see

18   trains coming and going?

19        A.    Yes.  If I look over the rail I could see

20   trains coming and going.

21        Q.    They are on a different level but you

22   could still see them coming and going?

23        A.    If I look over the rail yes, sir.

24        Q.    I guess that means you probably can hear

25   them too?

```
1        A.    Yes, sir.

2        Q.    Do you know if any trains came and went

3   during the stop?

4        A.    No, sir.  I can't recall.

5              MR. MONROE:  Let's go off the record.

6              (A brief recess was taken.)

7              MR. MONROE:  We're finished

8              (The deposition concluded at 11:16 a.m.)

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1                              DISCLOSURE

2     STATE OF GEORGIA          Deposition of Terry Milton

3     COUNTY OF HENRY           Date: July 30, 2009

4          Pursuant to Article 10.B of the Rules and
      Regulations of the Board of Court Reporting of the
5     Judicial Council of Georgia, I make the following
      disclosure:
6
           I am a Georgia Certified Court Reporter.  I am
7     here as a representative of American Court Reporting
      Co., Inc.
8
           I am not disqualified for a relationship of
9     interest under provisions of O.C.G.A. 9-11-28 (c).

10         American Court Reporting Co., Inc. was contacted
      by the offices of John R. Monroe to provide court
11    reporting services for this deposition.

12         American Court Reporting Co., Inc. will not be
      taking this deposition under any contract that is
13    prohibited by O.C.G.A. 15-14-37(a) and (b).

14         American Court Reporting Co., Inc. has no
      exclusive contract to provide reporting services with
15    any party to the case, any counsel in the case, or
      any reporter or reporting agency from whom a referral
16    might have been made to cover this deposition.

17         American Court Reporting Co., Inc. will charge
      its usual and customary rates to all parties in the
18    case, and a financial discount will not be given to
      any party to this litigation.
19
           This the 6th day of August, 2009.
20

21                              Stephanie J. Heisey

22                              Stephanie J. Heisey CCR # B-1222

23

24

25

1              C E R T I F I C A T E

2    STATE OF GEORGIA)

3    COUNTY OF HENRY)

4         I hereby certify that the foregoing transcript

5    was taken down, as stated in the caption, and the

6    proceedings were reduced to typewriting under my

7    direction and control.

8         I further certify that the transcript is a true

9    and correct record of the evidence given at the said

10   proceedings.

11        I further certify that I am neither a relative

12   or employee or attorney or counsel to any of the

13   parties, nor financially or otherwise interested in

14   this matter.

15        This the 6th day of August, 2009.

16

17

18

19

20              *Stephanie J. Heisey*

21         STEPHANIE J. HEISEY, CCR B-1222

22

23

24

25