IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

GEORGIACARRY.ORG, INC., et al.,

   Plaintiffs,

     v.

METROPOLITAN ATLANTA
RAPID TRANSIT AUTHORITY, et
al.,

   Defendants.

CIVIL ACTION FILE
NO. 1:09-CV-594-TWT

## ORDER

This is a civil rights and declaratory judgment case. It is before the Court on summary judgment motions from each side. For the reasons set forth below, the Defendants' Partial Motion to Dismiss [Doc. 10] and Defendants' Second Motion for Summary Judgment [Doc. 43] are GRANTED. The Plaintiffs' Motion for Partial Summary Judgment [Doc. 17] is GRANTED in part and DENIED in part. The Defendants' Partial Motion for Summary Judgment [Doc. 21], Plaintiffs' Second Motion for Summary Judgment [Doc. 40], and Plaintiffs' Motion in Limine [Doc. 33] are DENIED.

## I. Background

On May 14, 2008, Georgia Governor Sonny Perdue signed into law the Business Security and Employee Privacy Act.  The Business Security and Employee Privacy Act made several changes to Georgia's firearms laws.  The changes  took effect on July 1, 2008.  See 2008 Ga. Laws 1199.  One of those changes involves carrying a concealed firearm in vehicles providing public transportation.  Before July1, 2008, a person who boarded or attempted to board a bus or rail vehicle while carrying a concealed firearm committed the crime of boarding with a concealed weapon and the crime of carrying a concealed weapon.  O.C.G.A. § 16-12-123(b); O.C.G.A. § 16-11-126(a).  But, after July 1, 2008, a person "licensed or permitted to carry a firearm" may carry such firearm "in public transportation notwithstanding Code Sections 16-12-122 through 16-12-127."  O.C.G.A. § 16-11-127(e); see O.C.G.A. § 16-11-126(c).  Therefore, a person with a Georgia firearms license may now legally board a bus or rail vehicle while carrying a concealed firearm.

GeorgiaCarry.Org, Inc. is a public advocacy group whose mission is to "foster the rights of its members to carry firearms."  (Stone Decl. ¶ 6.)  It claims that some of its members want to use the Metropolitan Atlanta Rapid Transit Authority (MARTA) public transportation system while carrying their firearms, but fear that they will be "persecuted, harassed, and detained by MARTA police on account of their carrying

of firearms." (Id. ¶ 4.) On June 20, 2008, John Monroe, attorney for GeorgiaCarry.Org, met with Joseph Dorsey, the Assistant Chief of MARTA Police, to discuss MARTA's firearms policy. At this meeting, Monroe told Dorsey that, once MARTA developed a policy reflecting the changes to Georgia's firearms laws, he wanted a copy of the policy. Later that day, Monroe sent a follow-up email to Dorsey stating "[a]s we discussed, please send me your policy regarding encounters with people carrying firearms on the MARTA system after you develop one for the post-July 1, 2008 world." (Complaint, Ex. A.) On June 27, 2008, and again on July 8, 2008, Monroe sent Dorsey additional follow-up emails. No one from MARTA responded to Monroe's requests.

Several months later, one of GeorgiaCarry.Org's members tried to use the MARTA system while carrying a firearm. On October 14, 2008, Christopher Raissi drove to the Avondale MARTA station and parked his car in the south parking lot. He got out, went to the back of his car, and pulled out a handgun in a holster. Raissi reached behind his back and clipped the holster to the waistband of his pants. He pulled his shirt over the holster so that it was completely covered and then walked toward the station. All of this was seen by Malcolm Nicholas, a MARTA police officer who had been patrolling the parking lot. When Raissi started walking toward the station, Officer Nicholas radioed for backup. He provided a description of Raissi

and said that he was carrying a firearm. Officer Nicholas then followed Raissi as he walked toward the station, although for safety reasons he did not intend to stop him until backup arrived.

Raissi went directly to the fare machine in front of the MARTA station and purchased a ticket. By this point, Terry Milton, another MARTA police officer, had joined Officer Nicholas. After Raissi purchased his ticket, he turned around and saw Officers Nicholas and Milton looking at him. Officer Nicholas said "police" and told Raissi to stop, which he did. Officer Nicholas removed Raissi's handgun from its holster and said "what are you doing with a gun." Officer Nicholas then asked Raissi for his identification, firearms license, and social security number. Raissi provided each.

Using Raissi's identification and social security number, Officer Nicholas ran a Georgia Crime Information Center background check on Raissi to see if he had any outstanding warrants or prior felonies. After the background check came back clear, Officer Nicholas returned Raissi's identification and firearms license, but did not immediately return Raissi's handgun. Officers Nicholas and Milton took Raissi to a private hallway inside the station and then returned the handgun to him. Raissi re-holstered his handgun, and Officer Nicholas told him he was free to leave. Raissi's encounter with the officers lasted between fifteen and thirty minutes.

Two days after his encounter with MARTA police, Raissi sent a letter to Wanda Dunham, the Chief of MARTA Police. In the letter, he stated:

> Pursuant to the Georgia Open Records Law (O.C.G.A. § 50-18-70 et seq.) . . . you are hereby requested to make available for review and copying all files, records and other documents in your possession that refer, reflect or relate to the 14 October 2008 detention of Chris Raissi in the Avondale Marta station at approximately 2:00pm that afternoon.

(Complaint, Ex. D.) No one from MARTA responded to Raissi's request.

On March 5, 2009, GeorgiaCarry.Org and Raissi filed this lawsuit against MARTA, Wanda Dunham, Joseph Dorsey, and Officers Doe 1-5. Officers Doe 1-5 have now been identified in the parties' briefs, but not the Complaint, as Malcolm Nicholas and Terry Milton. The Plaintiffs assert three claims. First, the Plaintiffs assert search and seizure claims under 42 U.S.C. § 1983 for stopping Raissi without probable cause or reasonable suspicion. For these claims, the Plaintiffs seek compensatory damages, a declaration that MARTA's firearms policy is unconstitutional, and an injunction prohibiting future enforcement of the policy. Second, the Plaintiffs assert Privacy Act claims under 42 U.S.C. § 1983 because one or both of the officers asked Raissi for his social security number without providing adequate disclosures. For these claims, the Plaintiffs seek compensatory damages, an injunction removing Raissi's social security number from MARTA's records, a declaration that the officers violated the Privacy Act, and an injunction against future

violations. Third, the Plaintiffs assert Georgia Open Records Act claims for the Defendants' failure to respond to the Plaintiffs' Open Records Act requests. For these claims, the Plaintiffs seek a declaration that the Defendants violated the Open Records Act and an injunction requiring disclosure of the requested information.

The Defendants now move to dismiss the Plaintiffs' Open Records Act claims for lack of subject matter jurisdiction and move for summary judgment on the rest of the Plaintiffs' claims. The Plaintiffs, in turn, move for summary judgment on all of their claims and move for an order in limine excluding evidence from the Defendants about Raissi's encounter with Officers Nicholas and Milton because of spoilation of videotape evidence by the Defendants.

## II. Summary Judgment Standard

Summary judgment is appropriate only when the pleadings, depositions, and affidavits submitted by the parties show that no genuine issue of material fact exists and that the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The court should view the evidence and any inferences that may be drawn in the light most favorable to the nonmovant. Adickes v. S.H. Kress & Co., 398 U.S. 144, 158-59 (1970). The party seeking summary judgment must first identify grounds that show the absence of a genuine issue of material fact. Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). The burden then shifts to the nonmovant, who must go beyond

the pleadings and present affirmative evidence to show that a genuine issue of material

fact does exist.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 257 (1986).

## III.  Discussion

### A.    Fourth Amendment Claims

The Fourth Amendment protects "[t]he right of the people to be secure in their

persons, houses, papers, and effects, against unreasonable searches and seizures."

U.S. Const. Amend. IV.  In interpreting the Fourth Amendment, courts have put

police-citizen encounters into three categories:

> First, not every encounter between law enforcement officers and a citizen
> constitutes a seizure within the meaning of the Fourth Amendment.
> Some such contact, such as the mere approach and questioning of a
> willing person in a public place, involves no coercion and detention and
> hence is outside the domain of the Fourth Amendment.  Second, ever
> since Terry v. Ohio, [392 U.S. 1 (1968)], the Court has recognized a
> limited class of cases where the police-citizen encounter qualifies as a
> seizure within the Fourth Amendment but may be justified by less than
> probable cause.    Terry-type investigative stops satisfy Fourth
> Amendment strictures if the officer has an objective, reasonable
> suspicion of unlawful activity.  Third, some police-citizen encounters,
> such as a full-scale arrest, must be supported by probable cause.

United States v. Thompson, 712 F.2d 1356, 1359 (11th Cir. 1983) (internal citations

omitted).  The Plaintiffs and the Defendants agree that this case involves the second

category of police-citizen encounters: an investigative stop.  The Plaintiffs say that

Officers Nicholas and Milton were not entitled to conduct an investigative stop of

Raissi because they did not have reasonable suspicion that he was engaged in unlawful

activity. The Plaintiffs also say that, even if the officers were entitled to conduct an investigative stop, they did not conduct the stop in a reasonable manner. The Plaintiffs seek compensatory damages, a declaration that MARTA's firearms policy is unconstitutional, and an injunction prohibiting future enforcement of the policy.

The undisputed facts show that Officers Nicholas and Milton had reasonable suspicion that Raissi was engaged in unlawful activity. Officer Nicholas saw Raissi clip a holstered handgun to the waistband of his pants, pull his shirt over the holster so that it was completely covered, and walk towards the MARTA station. The Plaintiffs do not dispute this. On these facts alone, the officers had reasonable suspicion that Raissi was committing the crime of boarding a vehicle providing public transportation with a concealed weapon. A person commits the crime of boarding with a concealed weapon when such person "boards or attempts to board an aircraft, bus, or rail vehicle with any . . . firearm . . . concealed on or about his or her person or property which is or would be accessible to such person while on the aircraft, bus, or rail vehicle." O.C.G.A. § 16-12-123(b). The officers also had reasonable suspicion that Raissi was committing the crime of carrying a concealed weapon. "A person commits the [crime] of carrying a concealed weapon when such person knowingly has or carries about his or her person, unless in any open manner and fully exposed to view, . . . any . . . dangerous or deadly weapon or instrument of like character outside

of his or her home or place of business . . . ." O.C.G.A. § 16-11-126(a); see Lindsey v. State, 277 Ga. 772, 773 (2004).

The Plaintiffs say that a person with a Georgia firearms license may now board a bus or rail vehicle while carrying a concealed firearm, and that the officers had no reason to suspect that Raissi did not have a Georgia firearms license. O.C.G.A. § 16-11-127(e); O.C.G.A. § 16-11-126(c). But possession of a firearms license is an affirmative defense to, not an element of, the crimes of boarding with a concealed weapon and carrying a concealed weapon. In Lee v. State, 298 Ga. App. 630 (2009), the defendant was convicted of carrying a concealed weapon based on evidence that the defendant "retrieved a firearm from his back right passenger seat, tucked it in his belt, and covered it with his shirt." Id., at 633. On appeal, the defendant said that "because the State failed to present evidence that he did not have a valid license to carry a firearm, the evidence was insufficient to support his conviction for carrying a concealed weapon." Id. The Georgia Court of Appeals sustained the conviction and held that "it is [the defendant], not the State, that has the burden of proving he had a permit to carry the firearm." Id.; see London v. State, 235 Ga. App. 30, 33-34 (1998) (similar result).

The Plaintiffs say that the Georgia Supreme Court has held that the "[S]tate [must] present . . . evidence that [the defendant] did not have a license to carry the

pistol." Todd v. State, 235 Ga. 679, 680 (1975); see also Head v. State, 235 Ga. 677, 679 (1975). But those cases involved the separate and distinct crime of carrying a pistol without a license, for which the statutory language requires absence of a firearms license as an element of the crime. "A person commits the [crime] of carrying a pistol without a license when he has or carries on or about his person, outside of his home, motor vehicle, or place of business, any pistol or revolver without having on his person a valid license . . . ." O.C.G.A. § 16-11-128(a) (emphasis added). Those cases are, therefore, not relevant to the crime of boarding with a concealed weapon or the crime of carrying a concealed weapon.

Because a Georgia firearms license is an affirmative defense to the crime of boarding with a concealed weapon and the crime of carrying a concealed weapon, it does not matter if there was no reason to suspect that Raissi did not have a Georgia firearms license. After Raissi concealed his handgun and started walking toward the MARTA station, he had committed all of the acts required for the crime of boarding with a concealed weapon and the crime of carrying a concealed weapon. Officer Nicholas saw this happen. The officers were not then required "to explore and eliminate every theoretically plausible claim of innocence," including affirmative defenses, before making an investigative stop of Raissi. Ricciuti v. New York City Transit Auth., 124 F.3d 123, 128 (2d Cir. 1997); see also Jocks v. Tavernier, 316 F.3d

128, 135 (2d. Cir. 2003) ("[J]ust as probable cause may exist although a suspect is in fact innocent, probable cause may exist where the police do not know of the existence or validity of an exculpatory defense."); Humphrey v. Staszak, 148 F.3d 719, 724 (7th Cir. 1998) ("[E]ntrapment is an affirmative defense . . . [and] is not part of our Fourth Amendment probable cause-to-arrest analysis."); State v. Fry, 142 Wash. App. 456, 460 (2008) ("Medical authorization for marijuana use is an affirmative defense . . . [and] [a]ffirmative defenses are evaluated at trial, not by law enforcement at earlier stages of the proceedings.").

In other jurisdictions that treat a firearms license as an affirmative defense, courts have held that it does not matter if there was no reason to suspect that a person did not have a firearms license. In State v. Timberlake, 744 N.W.2d 390 (Minn. 2008), police officers stopped the defendant's car based solely on a 911 call from an identified private citizen. The caller said that he had just seen "a black male and black female . . . leaving a gas station in a white Pontiac Grand Prix," and that, before they left the gas station, he had seen the black male with a gun. Id. at 392. The officers' stop and subsequent search revealed evidence that was the basis of the defendant's conviction for felon in possession of a firearm. On appeal, the defendant did not dispute the reliability of the 911 call, but said that, "because it is legal in Minnesota for a private citizen to carry a permitted gun in public, police may not conduct an

investigat[ive] stop without additional evidence that the possession itself is illegal."
Id. at 394. The Minnesota Supreme Court sustained the conviction and held that
"consistent with our determination . . . that lack of a permit [is] not an element of the
offense, the police in this case did not need to know whether [the defendant] had a
permit in order to have a reasonable suspicion that [the defendant] was engaged in
criminal activity." Id. at 395. "[T]he officers had a reasonable basis to suspect that
[the defendant] was engaged in criminal activity, even without knowing whether he
had a permit, based on the caller's report that he saw [the defendant] with a gun in the
vehicle." Id.

Also, in United States v. Cooper, 293 Fed. Appx. 117 (3d Cir. 2008), police
officers stopped the defendant's car based solely on information from another police
officer who, while patrolling an area of Philadelphia, "observed [the defendant] lift
his shirt, displaying a silver handgun . . . then [return] to his car and [drive] away."
Id. at 118. The officers' stop and subsequent search revealed evidence that was the
basis of the defendant's conviction for various drug possession and firearm crimes.
On appeal, the defendant said that, "[b]ecause a firearm may be lawfully possessed
under some circumstances, . . . the facts here – [the officer's] mere viewing of [the
defendant] in possession of a weapon on a public street in Philadelphia – did not
create reasonable suspicion." Id. The Third Circuit sustained the conviction and held

that, because "licensure is an affirmative defense to a statutory violation for possession of a firearm," "an officer's observance of an individual's possession of a firearm in a public place in Philadelphia is sufficient to create reasonable suspicion to detain that individual for further investigation." Id. at 119-20; see United States v. Bond, 173 Fed. Appx. 144, 146 (3d Cir. 2006); United States v. Collins, Nos. 05-1810, 01-CR-00780, 2007 WL 4463594, at *4 (E.D. Pa. Dec. 19, 2007).

None of the cases cited by the Plaintiffs were from jurisdictions that treat a firearms license as an affirmative defense. See United States v. Ubiles, 224 F.3d 213, 214 (3d Cir. 2000); St. John v. McColley, No. 08-994, 2009 WL 2949302, at *4 (D.N.M. Sept. 08, 2009). Ubiles is a case from the Virgin Islands and, under Virgin Islands law, the absence of a firearm license is an element of the crime of unauthorized possession of a firearm. 14 V.I.C. § 2253(a); Gov't of the V.I. v. Isaac, 45 V.I. 334, 342 (V.I. Terr. Ct. 2004). St. John is a case from New Mexico and, under New Mexico law, it is not a crime to carry a firearm without a license so long as the firearm is carried openly, which the plaintiff in St. John did. N.M. Stat. Ann. § 30-7-2; St. John, 2009 WL 2949302, at *4 ("[M]erely 'showing a gun' . . . is not illegal in the State of New Mexico."). These cases are, therefore, distinguishable. See Collins, 2007 WL 4463594, at *4 ("Ubiles is distinguishable [because] the gun laws in the Virgin Islands are different from the gun laws in Pennsylvania.").

Once they decided to conduct an investigative stop of Raissi, Officers Nicholas and Milton were required to conduct the stop in a reasonable manner. The Plaintiffs say that the stop was unreasonable because the officers did not have any reason to seize Raissi's handgun, ask for Raissi's social security number, or take Raissi to a private hallway before returning his handgun. But each of the Plaintiffs' objections to the nature of the stop involves second-guessing of the officers' actions. The officers were entitled to take Raissi's handgun because they knew Raissi had concealed it on his person and would have easy access to it while they questioned him. See Pennsylvania v. Mimms, 434 U.S. 106, 112 (1977) ("The bulge in the jacket permitted the officer to conclude that [the defendant] was armed and thus posed a serious and present danger to the safety of the officer. In these circumstances, any man of 'reasonable caution' would likely have conducted the 'pat-down.'"). The officers were entitled to ask Raissi for his social security number because a background check would help the officers determine whether Raissi had any outstanding warrants or prior felonies that would disqualify him from legally carrying a firearm. See Illinois v. Wardlaw, 528 U.S. 119, 126 (2000); United States v. Hutchinson, 408 F.3d 796, 800-02 (D.C. Cir. 2005). And the officers were entitled to take Raissi to a private hallway before returning his handgun because it was safer for Raissi to re-holster his handgun out of public view. (Nicholas Dep. at 23); cf.

Mimms, 434 U.S. at 112 (a police officer may, for safety reasons, order a driver out of the car during a lawful stop).

Because Officers Nicholas and Milton were entitled to conduct an investigative stop of Raissi, and because the stop itself was reasonable, the Defendants did not violate Raissi's Fourth Amendment rights. This resolves the Plaintiffs' claims for compensatory damages. It does not necessarily resolve the Plaintiffs' claims for declaratory and injunctive relief, which address what MARTA officers may do in the future. It does not resolve these claims because there is evidence that MARTA has a policy of stopping anyone seen carrying a firearm, even if that person is carrying the firearm openly. (Dorsey Second Aff. ¶ 9); (Nicholas Dep. at 29-31). When a person is carrying a firearm openly, reasonable suspicion of unlawful activity must obviously involve some unlawful act other than the crime of boarding with a concealed weapon or the crime of carrying a concealed weapon. There is also evidence that some members of GeorgiaCarry.Org want to use the MARTA system while carrying firearms and that interest does not appear limited to carrying a concealed firearm. (Stone Decl. ¶¶ 4-6.) Therefore, even after concluding that the Defendants did not violate Raissi's Fourth Amendment rights, the Plaintiffs still have standing to seek a declaration that MARTA's firearms policy as applied to any person openly carrying

a firearm is unconstitutional and an injunction prohibiting enforcement of such policy. See 31 Foster Children v. Bush, 329 F.3d 1255, 1265 (11th Cir. 2003).

It is not, however, necessary to decide whether MARTA's firearms policy as applied to any person openly carrying a firearm is unconstitutional. In addition to standing, the Court must also determine for itself whether declaratory and injunctive relief are appropriate remedies. For this case, they are not. See El Dia, Inc. v. Hernandez Colon, 963 F.2d 488, 498 n.11 (1st Cir. 1992); Eccles v. Peoples Bank of Lakewood Village, 333 U.S. 426, 431 (1948). First, to grant the Plaintiffs declaratory and injunctive relief would require the Court to decide uncertain questions of state and constitutional law. See El Dia, 963 F.2d at 494 ("[D]eclaratory judgments concerning the constitutionality of government conduct will almost always be inappropriate when the constitutional issues are freighted with uncertainty and the underlying grievance can be remedied for the time being without gratuitous exploration of uncharted constitutional terrain."); State Auto Ins. Cos. v. Summy, 234 F.3d 131, 135 (3d Cir. 2000) ("[W]here the applicable state law is uncertain or undetermined, district courts should be particularly reluctant to entertain declaratory judgment actions."). Second, the Plaintiffs never clearly distinguished their claims for compensatory damages from their claims for declaratory and injunctive relief, and so the parties have not adequately discussed the issue of general declaratory and injunctive relief. See

*Eccles*, 333 U.S. at 434 ("Judgment on issues of public moment based on such evidence, not subject to probing by judge and opposing counsel, is apt to be treacherous."). Third, because case law interpreting the Fourth Amendment requires highly case-specific determinations of the reasonableness of particular searches and seizures, general declaratory and injunctive relief may not provide significant guidance to any party. See El Dia, 963 F.2d at 494 ("[C]ourts should withhold declaratory relief as a matter of discretion if such redress is unlikely to palliate, or not needed to palliate, the fancied injury . . . ."). Fourth, if any members of GeorgiaCarry.Org suffer a constitutional violation in the future, they will have an adequate remedy at law under section 1983, just as Raissi would have had if his constitutional rights had been violated. See City of Los Angeles v. Lyons, 461 U.S. 95, 113 (1983); Daniels v. Southfort, 6 F.3d 482, 486 (7th Cir. 1993). Taken as a whole, these four reasons demonstrate that declaratory and injunctive relief are not appropriate remedies for this case. Therefore, the Defendants are entitled to summary judgment on the Plaintiffs' Fourth Amendment claims.

B.      Privacy Act Claims

Section 7(b) of the Privacy Act provides that "[a]ny Federal, State, or local government agency which requests an individual to disclose his social security

account number shall inform that individual whether that disclosure is mandatory or voluntary, by what statutory or other authority such number is solicited, and what uses will be made of it." 5 U.S.C. § 552a note; 88 Stat. 1909. Although section 7 of the Privacy Act does not itself provide for a private right of action, "the rights conferred by section 7 may be enforced under [section] 1983." Schwier v. Cox, 340 F.3d 1284, 1292 (11th Cir. 2003). The Plaintiffs say that Officers Nicholas and Milton asked Raissi for his social security number without providing adequate disclosures. The Plaintiffs seek compensatory damages, an injunction removing Raissi's social security number from MARTA's records, a declaration that the officers violated the Privacy Act, and an injunction against future violations.

The Court no longer has jurisdiction to decide the Plaintiffs' Privacy Act claims for a declaration that the officers violated the Privacy Act and an injunction against future violations. Claims are "moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." Powell v. McCormack, 395 U.S. 486, 496 (1969). The officers asked Raissi for his social security number so that they could verify the results of a Georgia Crime Information Center background check. In March 2009, MARTA police stopped running Georgia Crime Information Center background checks on individuals who are stopped for carrying a firearm but provide a Georgia firearms license. "Therefore, social security numbers of these

individuals are no longer requested." (Dorsey First Aff. ¶ 5.)  This change moots the Plaintiffs' claims.  "[A] challenge to a <u>governmental</u> action [is] mooted when the alleged wrongdoers have ceased the allegedly illegal behavior and the court can discern no reasonable chance that they will resume it upon termination of the suit." <u>Troiano v. Supervisor of Elections</u>, 382 F.3d 1276, 1284 (11th Cir. 2004).

The Plaintiffs say that the Defendants continue to run Georgia Crime Information Center background checks on individuals who are stopped for carrying a firearm and <u>do not</u> provide a Georgia firearms license. (Dorsey Dep. at 12-13.) The Plaintiffs say that, in these situations, the Defendants still ask for a social security number without providing adequate disclosures.  But, even if this is true, the Plaintiffs do not have standing to assert any claims based on this particular policy or practice. The Plaintiffs do not say that members of GeorgiaCarry.Org will refuse to provide a Georgia firearms license if MARTA police officers ask for one.  (Stone Decl. ¶¶ 4-5.) Indeed, the Plaintiffs say that members of GeorgiaCarry.Org "want to use the MARTA system while lawfully carrying their firearms," and that means also carrying a Georgia firearms license.  (Compl. ¶ 26); <u>see</u> O.C.G.A. § 16-11-128(a).  It seems very unlikely that members of GeorgiaCarry.Org would carry a Georgia firearms license but then refuse to provide it to MARTA police officers.  "[A request] for injunctive and declaratory relief requires . . . the plaintiff [to show] a real and

immediate threat of future harm." Elend v. Basham, 471 F.3d 1199, 1207 (11th Cir. 2006). Therefore, the Defendants are entitled to dismissal of the Plaintiffs' Privacy Act claims for an injunction against future violations.

The Court, however, does have jurisdiction to decide the Plaintiffs' Privacy Act claims for compensatory damages and an injunction removing Raissi's social security number from MARTA's records. MARTA's change of policy does not moot these claims because the alleged injuries supporting these claims have already occurred or have "continuing, present adverse effects." Lyons, 461 U.S. at 102. These claims address what the officers have already done, not what MARTA officers may do in the future.

The Defendants say that, even so, the Court should not consider these claims because the Plaintiffs did not specifically request compensatory damages or this type of injunction in their Complaint. (Compl. ¶ 37.) But Rule 54(c) provides that a court "should grant the relief to which each party is entitled, even if the party has not demanded that relief in its pleadings." Fed. R. Civ. P. 54(c). Because "the demand for relief does not constitute part of the pleader's claim for relief, a failure to demand the appropriate relief will not result in a dismissal. The question is not whether plaintiff has asked for the proper remedy but whether plaintiff is entitled to any remedy." 10 Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal

Practice and Procedure § 2664 (3d ed. 1998); <u>see also</u> <u>Carter v. Diamondback Golf Club, Inc.</u>, 222 Fed. Appx. 929, 931 (11th Cir. 2007). With the jurisdictional and procedural basis established, the Court will now discuss whether section 7(b) of the Privacy Act applies to MARTA, and if so, whether the Defendants violated it.

Section 7(b) of the Privacy Act applies to MARTA because the totality of the facts shows that MARTA is a government agency. Section 7(b) of the Privacy Act only applies to a "Federal, State, or local government agency." The Privacy Act does not itself define this phrase, and courts have not defined this phrase in any uniform way. Instead, courts have given this phrase a liberal construction and have looked to a variety of facts to determine on a case-by-case basis whether an entity is a government agency. <u>See</u> <u>Krebs v. Rutgers</u>, 797 F. Supp. 1246, 1253 (D.N.J. 1992); <u>Dong v. Smithsonian Inst.</u>, 878 F. Supp. 244, 247 (D.D.C. 1995). Here, the totality of the facts shows that MARTA is a government agency. First, MARTA has certain immunities that are usually availably only to government agencies. MARTA is immune from punitive damages for state law claims. <u>See</u> <u>Metropolitan Atlanta Rapid Transit Auth. v. Boswell</u>, 261 Ga. 427, 427-28 (1991). And MARTA's board members are immune from civil suits arising out of their good faith, official actions. <u>See</u> O.C.G.A. § 51-1-20 (providing such immunity for board members of a (local governmental agency, board, authority, or entity); <u>Johnson v. Metropolitan Atlanta</u>

Rapid Transit Auth., 207 Ga. App. 869, 871 (1993).  Second, MARTA's police officers have the same authority as police officers for local governments.  MARTA's police officers are peace officers with "authority equivalent to the authority of a policeman of the city or county in which he is discharging his duties."  1965 Ga. Laws 2256; see also Dong, 878 F. Supp. at 249.  Third, some of MARTA's decisions are subject to the type of judicial review usually associated with government action.  "Any person aggrieved by any determination of the Board as to any charge or scheduled service . . . may [be] challenge[d] [by] a petition in equity filed . . . in any superior court of the county . . . in which the charge or scheduled service may be applicable."  1965 Ga. Laws 2258.  Fourth, MARTA provides, as declared by the Georgia General Assembly, "an essential governmental function and public purpose of the City of Atlanta."  1965 Ga. Laws 2275; see Ingerman v. Delaware. River Port Auth., 630 F. Supp. 2d 426, 440 (D.N.J. 2009) (evaluating statutory similar language).  Taken together, these facts show that MARTA is generally treated like a government agency, and as such, MARTA should have to comply with the requirements of section 7(b) of the Privacy Act.

The undisputed facts also show that one or both of the officer Defendants violated section 7(b) of the Privacy Act.  After Officers Nicholas and Milton stopped Raissi, Officer Nicholas asked Raissi for his identification, firearms license, and social

security number.  Raissi provided each.  But neither Officer told Raissi whether he had to provide his social security number, what authority they relied on in asking for the number, or what the number would be used for.  By asking Raissi for his social security number without providing these disclosures, the officers violated section 7(b) of the Privacy Act.  <u>See</u> 5 U.S.C. § 552a note; 88 Stat. 1909.  The Defendants do not dispute these facts or that the Privacy Act requires these disclosures.  Nevertheless, it is not clear which of the three Defendants should be liable to the Plaintiff Raissi.  Therefore, the Plaintiffs' motion for partial summary judgment should be denied.  Liability issues and damages will be determined at trial.

C.    <u>Georgia Open Records Act Claims</u>

The Georgia Open Records Act provides that, subject to certain exceptions, "[a]ll public records of an agency . . . shall be open for a personal inspection by any citizen of this state at a reasonable time and place; and those in charge of such records shall not refuse this privilege to any citizen."  O.C.G.A. § 50-18-70(b).  On a request by a citizen for access to public records, "[t]he individual in control of such public record or records shall have a reasonable amount of time to determine whether or not the record or records requested are subject to access under this article and to permit inspection and copying.  In no event shall this time exceed three business days."  O.C.G.A. § 50-18-70(f).  The Plaintiffs say no one from MARTA responded to the

various requests for records made by Monroe and Raissi. The Plaintiffs seek a declaration that the Defendants violated the Open Records Act and an injunction requiring the disclosure of the requested information.

The Court does not have jurisdiction to decide the Plaintiffs' Open Records Act claims. The Court does not have federal question jurisdiction because these claims are based on state law. The Court does not have diversity jurisdiction because there is no diversity of citizenship in this case. That leaves supplemental jurisdiction. "[I]n any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). "The constitutional 'case or controversy' standard confers supplemental jurisdiction over all state claims which arise out of a common nucleus of operative fact with a substantial federal claim." Parker v. Scrap Metal Processors, Inc., 468 F.3d 733, 743 (11th Cir. 2006).

The Court does not have supplemental jurisdiction because the Plaintiffs' Open Records Act claims do not arise out of a common nucleus of operative fact with any federal claim in this case. The Plaintiffs' Open Records Act claims are very narrow claims. These claims involve whether the records requested are subject to the Open

Records Act, whether the Defendants responded to the requests, and if the Defendants responded, when they responded. See Ford v. City of Oakwood, 905 F. Supp. 1063, 1066 (N.D. Ga. 1995). None of these facts is at all relevant to the Plaintiffs' search and seizure or Privacy Act claims. See Salei v. Boardwalk Regency Corp., 913 F. Supp. 993, 1000 (E.D. Mich. 1996). Those claims involve whether the Defendants were entitled to stop Raissi and how the Defendants conducted the stop. The Plaintiffs say that the requested records are relevant to their federal claims, but the Plaintiffs' Open Records Act claims only involve the request for the records and not the actual records themselves. Therefore, the Defendants are entitled to dismissal of the Plaintiffs' Open Records Act claims.

> D.    Spoilation of Videotape Evidence

"Spoilation is the destruction or significant alteration of evidence, or the failure to preserve property for another's use as evidence in pending or reasonably foreseeable litigation." Graff v. Baja Marine Corp., 310 Fed. Appx. 298, 301 (11th Cir. 2009). The Plaintiffs say that MARTA had a video surveillance system that probably recorded Raissi's encounter with Officers Nicholas and Milton on October 14, 2008. But the Plaintiffs say that the system automatically deletes recordings thirty days after they are made and that no one from MARTA saved the video from October 14, 2008, before it was deleted. The Plaintiffs say that the Defendants had an

obligation preserve the video because, on October 16, 2008, Raissi sent Dunham a letter requesting "all files, records, and other documents . . . that refer, reflect or relate to the 14 October 2008 detention of Chris Raissi." (Complaint, Ex. D.) The Plaintiffs seek an order in limine excluding evidence from the Defendants about Raissi's encounter with Officers Nicholas and Milton.

Even assuming spoilation occurred, the Plaintiffs cannot show prejudice. <u>See Flury v. Daimler Chrysler Corp.</u>, 427 F.3d 939, 944 (11th Cir. 2005). Raissi, Officer Nicholas, and Officer Milton have all given depositions about what happened on October 14, 2008. There are very few differences in their testimony, and the Defendants agree almost entirely with Raissi's testimony. (Defs.' Resp. to Pls.' Mot. in Limine, at 8-10). The only disputed fact is how long the encounter lasted, with the Defendants saying it took eight to ten minutes and the Plaintiffs saying it took fifteen to thirty minutes. But how long the encounter lasted is not material. Even assuming the encounter lasted as long as thirty minutes, which the Court has done, the Defendants are still entitled to summary judgment on the Plaintiffs' search and seizure claims. Therefore, the Plaintiffs are not entitled to an order in limine excluding evidence from the Defendants about Raissi's encounter with Officers Nicholas and Milton.

## IV.  Conclusion

For the reasons set forth above, the Defendants' Partial Motion to Dismiss [Doc. 10] and Defendants' Second Motion for Summary Judgment [Doc. 43] are GRANTED.  The Plaintiffs' Motion for Partial Summary Judgment [Doc. 17] is GRANTED in part and DENIED in part.  The Defendants' Partial Motion for Summary Judgment [Doc. 21], Plaintiffs' Second Motion for Summary Judgment [Doc. 40], and Plaintiffs' Motion in Limine [Doc. 33] are DENIED.

SO ORDERED, this 14th day of December, 2009.


/s/Thomas W. Thrash
THOMAS W. THRASH, JR.
United States District Judge